United States Court of Appeals
Fifth Circuit

**F I L E D**

**July 25, 2005**

Charles R. Fulbruge III
Clerk

In the United States Court of Appeals

For the Fifth Circuit

_____

No. 04-30445

_____

KATIE COLEMAN,

                        Plaintiff,

                        versus

SCHOOL BOARD OF RICHLAND PARISH,

                        Defendant - Third Party Plaintiff -
                        Appellant,

                        versus

MID-CONTINENT CASUALTY INSURANCE CO.,

                        Third Party Defendant - Appellee.

_____

Appeal from the United States District Court
For the Western District of Louisiana

_____

Before HIGGINBOTHAM, SMITH, and BENAVIDES, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

Mid-Continent Casualty Insurance Company agreed to insure the Richland Parish School Board against various risks, including loss resulting from claims based on actual or alleged racial discrimination, racial harassment, and breach of contract. Following execution of this agreement, a lawsuit was filed against the School Board alleging federal claims for intentional racial

discrimination, and state claims for breach of contract and abuse of rights. Mid-Continent refused to defend the suit on grounds that the policy excluded from coverage acts committed with knowledge of their wrongful nature or with intent to cause damage. We find that the policy did not provide coverage for claims alleging acts of intentional racial discrimination committed by members of the School Board. However, we also conclude that Mid-Continent breached its duty to defend the School Board because the plaintiff's complaint alleged non-excluded claims for breach of contract and abuse of rights.

I

Katie Coleman, an African-American woman, applied for the newly-created position of associate principal at Rayville Elementary School in Rayville, Louisiana. Coleman, who had previously worked as a teacher in another Parish, was awarded the position and received a two-year contract of employment. She began serving as associate principal on September 6, 2000. In October 2000, she was asked to resign by the superintendent of the School Board. She refused to comply. The School Board then held a hearing to consider nine separate charges of insubordination levied against Coleman and, after finding her guilty of four, voted to terminate her employment.[1]

_____

[1] The charges included seven allegations related to Coleman's failure to perform "bus duty," one allegation that Coleman addressed the Rayville Elementary principal in an unprofessional and insubordinate manner, and one allegation that Coleman improperly used a federally-funded copier for a non-designated use.

2

Coleman filed suit against the School Board alleging that she had been discriminated against and terminated on account of her race. She brought claims under Title VII of the Civil Rights Act,[2] 42 U.S.C. §§ 1981 and 1983, and pleaded state law causes of action for breach of contract and abuse of rights. Coleman alleged that the position of associate principal at Rayville Elementary had been created as a concession by white members of the School Board only after African-American members agreed to campaign within the African-American community on behalf of a school bond proposal to be voted on in October of 2000. She claimed that she accepted the position without knowledge of these "political under-currents."

Coleman alleged that the next business day after the bond proposal passed, she was asked to resign. According to Coleman, the superintendent "explained the political reality of her appointment and told her that she risked ruining her career if she did not resign." She alleged that he then threatened her with continuous "write-ups" and eventual termination if she did not relent to his demands, and offered to buy out one year of her two-year contract. She claimed that after this meeting, she was subjected to disparate enforcement of the Board's rules and regulations, and was continuously written-up for infractions that she did not commit. These events ultimately culminated in her termination by the Board without the consent and approval of

_____

[2] 42 U.S.C. § 2000e *et seq.*

several African-American members.

Prior to terminating Coleman, the School Board purchased an Educators Legal Liability Policy from Mid-Continent. The policy obligated Mid-Continent to defend and indemnify the Board, its directors, trustees, officers, and employees against loss resulting from any "claim" made during the policy period, which ran from October 11, 2000, through October 11, 2001. The policy defined "claim" as any written notice received by an insured, or any judicial or administrative proceeding initiated against an insured, seeking to hold the insured responsible or liable for a "wrongful act." The policy defined "wrongful act" as "any actual or alleged act, error, omission, misstatement, misleading statement, neglect or breach of duty" committed by an insured party in the discharge of his duties, including:

    (1)    actual or alleged discrimination, whether based upon race, sex, age, national origin, religion, disability or sexual orientation;

    (2)    actual or alleged sexual or racial harassment;

    (3)    actual or alleged libel, slander or other defamation;

    (4)    actual or alleged invasion of privacy; or

    (5)    actual or alleged interference with or breach of any employment contract, whether oral, written, express or implied.

The policy also contained a provision excluding coverage for loss resulting from any claim "brought about or contributed to in fact by any dishonest, fraudulent or criminal Wrongful Act or by any

Wrongful Act committed with actual knowledge of its wrongful nature or with intent to cause damage."

The School Board tendered the defense of Coleman's lawsuit to Mid-Continent pursuant to the terms of the policy. Mid-Continent denied coverage and declined to defend the suit, prompting the School Board to file a third-party claim against Mid-Continent. Mid-Continent filed a motion for summary judgment arguing that it had no duty to defend or indemnify the Board on grounds that coverage for Coleman's claims was precluded by the exclusion for acts committed with actual knowledge of their wrongful nature or intent to cause damage. The School Board filed a cross-motion for summary judgment arguing that it was entitled to a defense and indemnity on grounds that the policy explicitly provided coverage for actual or alleged racial discrimination and racial harassment.

While these motions were pending, the School Board defended against Coleman's suit at its own cost and ultimately reached a settlement. Following this settlement, the district court entered summary judgment in favor of Mid-Continent on the School Board's third-party claim, and denied the Board's motion for summary judgment. The court found that coverage for all of Coleman's claims was precluded by the policy's intentional acts exclusion. The Board timely appealed.

II

We review the grant of a motion for summary judgment *de novo*,

5

applying the same standards employed by the district court.[3] "We review the legal question of the district court's interpretation of an insurance contract *de novo*, as well as its determination of state law."[4] Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[5] The party moving for summary judgment "bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact."[6] The burden then shifts to the non-moving party to "show the existence of a genuine fact issue for trial."[7] We view all evidence and reasonable inferences from the evidence in the light most favorable to the non-moving party.[8]

### III

On appeal, the School Board contends that the district court erred in holding that Mid-Continent was not obligated to defend and indemnify the Board against claims alleging intentional racial

---

[3] *See Blakely v. State Farm Mut. Auto Ins. Co.*, 406 F.3d 747, 750 (5th Cir. 2005).

[4] *Id.* (citations omitted).

[5] FED. R. CIV. P. 56(c).

[6] *Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 349 (5th Cir. 2005).

[7] *Id.*

[8] *Id.* at 350.

discrimination.  In addition, the School Board argues that even if coverage for intentional discrimination were excluded, Mid-Continent would still be obligated to defend against Coleman's suit because her complaint alleged non-excluded claims for breach of contract and abuse of rights.  We take up these arguments in turn.

A

The School Board's primary argument on appeal centers on its contention that Mid-Continent was obligated to defend and indemnify it against the totality of Coleman's lawsuit because the policy explicitly provided coverage for actual or alleged racial discrimination and racial harassment.  The Board acknowledges, as it must, the presence of the exclusion for intentional acts, but urges that the exclusion cannot be squared with the policy's explicit coverage of racial discrimination and racial harassment as both are inherently intentional in nature.  The Board argues that any attempt to reconcile the policy's exclusion with its coverage for discrimination and harassment leads to the absurd result that coverage is available only for "unintentional" "intentional" acts.  Moreover, the Board posits that even if this result were permissible under established rules of contract interpretation, it would run afoul of Louisiana's reasonable expectations doctrine.

Mid-Continent rejects these contentions, arguing that coverage is available only for wrongful acts committed without knowledge of their wrongful nature or with intent to cause damage.  It claims

7

that this limitation does not render coverage for discrimination or harassment illusory because it cuts back, but does not wholly eliminate, such coverage.  In addition, it asserts that limiting coverage of discrimination and harassment claims in this manner is consistent with Louisiana public policy.  Accordingly, Mid-Continent contends that it had no duty to defend or indemnify the School Board against any of Coleman's claims.

1

The parties agree that Louisiana law must guide our interpretation of the insurance policy.[9]  Under Louisiana law, "an insurance policy is a contract that must be construed in accordance with the general rules of interpretation of contracts set forth in the Louisiana Civil Code."[10]  Under the Civil Code, "[t]he judiciary's role in interpreting insurance contracts is to ascertain the common intent of the parties to the contract."[11]  "The words of a contract must be given their generally prevailing meaning,"[12] and "[w]hen the words of a contract are clear and explicit and lead to no absurd consequences, no further

_____

[9] *See Thermo Terratech v. GDC Enviro-Solutions, Inc.*, 265 F.3d 329, 334 (5th Cir. 2001) (finding that provisions of an insurance policy are interpreted in accordance with the law of the state in which the policy was delivered).

[10] *Am. Int'l Specialty Lines Ins. Co. v. Canal Indem. Co.*, 352 F.3d 254, 262 (5th Cir. 2003).

[11] *Mayo v. State Farm Mut. Auto. Ins. Co.*, 869 So. 2d 96, 99 (La. 2004) (citing LA. CIV. CODE ANN. art. 2045 (West 1987)).

[12] LA. CIV. CODE ANN. art. 2047 (West 1987).

8

interpretation may be made in search of the parties' intent."[13] Moreover, "[e]ach provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole."[14] Importantly, Louisiana law mandates that an insurance policy "should not be interpreted in an unreasonable or strained manner so as to enlarge or to restrict its provisions beyond what is reasonably contemplated by its terms or so as to achieve an absurd conclusion."[15]

With respect to coverage, the insured bears the burden of proving that the incident giving rise to a claim falls within the policy's terms.[16] However, "the insurer bears the burden of proving the applicability of an exclusionary clause within the policy."[17] Exclusionary provisions must be read together with the entire policy, and are construed strictly against the insurer and in favor of coverage.[18] Any ambiguities within an exclusionary provision or

---

[13] LA. CIV. CODE ANN. art. 2046 (West 1987); *see In re Liljeberg Enters., Inc.*, 304 F.3d 410, 440 (5th Cir. 2002).

[14] LA. CIV. CODE ANN. art. 2050 (West 1987).

[15] *La. Ins. Guar. Ass'n.*, 630 So. 2d at 763; *see also Mayo*, 869 So. 2d at 99-100 ("The rules of construction do not authorize a perversion of the words or the exercise of inventive powers to create an ambiguity where none exists or the making of a new contract when the terms express with sufficient clarity the parties' intent."); *Reynolds v. Select Props., Ltd.*, 634 So. 2d 1180, 1183 (La. 1994).

[16] *See Doerr v. Mobil Oil Corp.*, 774 So. 2d 119, 124 (La. 2000).

[17] *Id.*

[18] *See Garcia v. Saint Bernard Parish Sch. Bd.*, 576 So. 2d 975, 976 (La. 1991); *Vallier v. Oilfield Constr. Co.*, 483 So. 2d 212, 215 (La. Ct. App. 1986).

the policy as a whole must be construed against the insurer and in favor of coverage.[19] To this end, ambiguities within an insurance policy will "be resolved by ascertaining how a reasonable insurance policy purchaser would construe the clause at the time the insurance contract was entered."[20] This rule, known as the "reasonable expectations doctrine," requires that a court construe an ambiguous insurance policy "to fulfill the reasonable expectations of the parties in the light of the customs and usages of the industry."[21] Courts employing this rule may extend coverage to meet the reasonable expectations of the insured, even though a close examination of the policy reveals that such expectations are in conflict with the expressed intent of the insurer.[22] However,

---

[19] LA. CIV. CODE ANN. art. 2056 (West 1987) ("In case of doubt that cannot be otherwise resolved, a provision in a contract must be interpreted against the party who furnished its text."); *see Mayo*, 869 So. 2d at 100 ("Ambiguous policy provisions are generally construed against the insurer and in favor of coverage. Under this rule of strict construction, equivocal provisions seeking to narrow an insurer's obligation are strictly construed against the insurer." (citation omitted)); *Reynolds*, 634 So. 2d at 1183 ("[A] provision which seeks to narrow the insurer's obligation is strictly construed against the insurer, and, if the language of the exclusion is subject to two or more reasonable interpretations, the interpretation which favors coverage must be applied."); *La. Ins. Guar. Ass'n*, 630 So. 2d at 764 ("If after applying the other general rules of construction an ambiguity remains, the ambiguous contractual provision is to be construed against the drafter, or, as originating in the insurance context, in favor of the insured."); *RPM Pizza, Inc. v. Auto. Cas. Ins. Co.*, 601 So. 2d 1366, 1369 (La. 1992) ("[E]ven if [an] exclusion is deemed ambiguous, insurance policies must be liberally construed in favor of coverage, and provisions susceptible of different meanings must be interpreted with a meaning that renders coverage effective and not with one that renders it ineffective.").

[20] *Breland v. Schilling*, 550 So. 2d 609, 610-11 (La. 1989).

[21] *La. Ins. Guar. Ass'n*, 630 So. 2d at 764 (quoting *Trinity Indus., Inc. v. Ins. Co. of N. Am.*, 916 F.2d 267, 269 (5th Cir. 1990)) (internal quotation marks omitted).

[22] *Id.* at 764 n.9 (citing ROBERT E. KEETON & ALAN I. WIDISS, INSURANCE LAW § 6.13 (1988)).

10

when the "language of an insurance policy is clear, courts lack the authority to change or alter its terms under the guise of interpretation."[23]

2

Looking to the plain language of the policy, coverage is clearly available for loss caused by a "Wrongful Act," including actual or alleged racial discrimination and harassment. In addition, the policy clearly excludes from coverage "any Wrongful Act committed with actual knowledge of its wrongful nature or with intent to cause damage." Thus, the clear and explicit language of the policy indicates that coverage is available for acts of racial discrimination or harassment only if they are committed by an insured without actual knowledge of their wrongful nature or intent to cause damage.

The School Board argues that this interpretation contravenes Louisiana's established rules of contract interpretation. Specifically, the Board contends that acts of racial discrimination and harassment necessarily involve knowledge of their wrongful nature and intent to cause harm, and that by limiting coverage of such claims to those involving "unintentional" acts, the policy offers coverage that is illusory and meaningless, giving rise to ambiguity which must be resolved in favor of the insured. Further, the Board urges that this result cuts against the reasonable

---

[23] *Id.* at 764.

expectations raised by the policy's coverage provisions, requiring that coverage be found under the reasonable expectations doctrine.

A number of courts have held that an insurance policy that purports to cover certain intentional acts or torts while simultaneously limiting coverage to unintentional or unexpected acts is ambiguous and must be construed against the drafter in favor of coverage.[24] Among these cases, the School Board relies heavily on the unpublished opinion of the District Court for the Eastern District of Louisiana in *Manis v. St. Paul Fire & Marine*

---

[24] *See North Bank v. Cincinnati Ins. Cos.*, 125 F.3d 983 (6th Cir. 1997) (finding ambiguity when an insurance policy provided coverage for acts of discrimination, yet excluded coverage for acts which did not occur unexceptedly or unintentionally); *Hurst-Rosche Eng'rs, Inc. v. Commercial Union Ins. Co.*, 51 F.3d 1336 (7th Cir. 1995) (same with respect to intentional torts such as libel, slander, defamation, false arrest, malicious prosecution, and humiliation while simultaneously limiting coverage to unintentional acts); *Tews Funeral Home, Inc. v. Ohio Cas. Ins. Co.*, 832 F.2d 1037, 1045 (7th Cir. 1987) (same with respect to advertising injury); *Liberty Life Ins. Co. v. Commercial Union Ins. Co.*, 857 F.2d 945, 950-51 (4th Cir. 1988) (vacating summary judgment in favor of insurer on grounds that potential ambiguity was raised by apparent conflict between policy's coverage of libel, slander, defamation and unfair competition, and limitation of coverage to unintentional or unexpected injuries); *Titan Indem. Co. v. Newton*, 39 F. Supp. 2d 1336, 1344 (N.D. Ala. 1999) (finding policy ambiguous when it provided coverage for false arrest, unlawful prosecution, and violations of civil rights, and then excluded coverage for intentional acts); *Lineberry v. State Farm Fire & Cas. Co.*, 885 F. Supp. 1095, 1099 (M.D. Tenn. 1995) (same with respect to invasion of privacy); *Lincoln Nat'l Health & Cas. Ins. Co. v. Brown*, 782 F. Supp. 110, 113 (M.D. Ga. 1992) (same with respect to false arrest, malicious prosecution, and assault and battery); *Purrelli v. State Farm Fire & Cas. Co.*, 698 So. 2d 618, 619-20 (Fla. Dist. Ct. App. 1997) (same with respect to invasion of privacy); *Mo. Prop. & Cas. Ins. Guar. Ass'n v. Petrolite Corp.*, 918 S.W.2d 869, 873 (Mo. Ct. App. 1996) (finding an insurance policy that extended coverage to unintentional acts, including acts of discrimination, to be ambiguous, "complete nonsense," and oxymoronic); *Titan Indem. Co. v. Riley*, 641 So. 2d 766, 768 (Ala. 1994) (same with respect to malicious prosecution, assault and battery, wrongful entry, piracy, and other intentional torts); *see also Fed. Ins. Co. v. Stroh Brewing Co.*, 127 F.3d 563, 571 (7th Cir. 1997) (refusing to interpret a policy so that covered acts of discrimination were completely excluded by a later provision when meaning of provision was genuinely ambiguous); *Transamerica Ins. Group v. Rubens*, 1999 WL 673338 (S.D.N.Y. Aug. 27, 1999) (approving of the reasoning in *North Bank v. Cincinnati Ins. Cos.*, 125 F. 3d 983 (6th Cir. 1997)).

*Insurance*.[25]  In *Manis*, the court addressed whether an insurance policy issued to a city provided coverage for claims arising under § 1983 and the Louisiana Civil Code alleging that city police officers violated the plaintiff's civil rights by intentionally using excessive force during the course of an arrest and detention. The policy provided coverage for losses resulting from claims based on injuries caused by "wrongful acts" such as, *inter alia*, false arrest, malicious prosecution, and violations of civil rights protected under federal or state laws.  The policy limited coverage in two ways.  First, it defined "wrongful act" as "any error, omission or negligent act."[26]  Second, it expressly excluded coverage for "injury or damage that results from any criminal, dishonest or fraudulent act or omission."[27]  The court found that it could harmonize the policy's coverage and exclusionary provisions by interpreting the policy as providing coverage for acts which "constitute[] error, omission or negligence, but [are] not criminal, dishonest, or fraudulent."[28]

The court found this interpretation "cramped," noting that it would preclude recovery for all excessive force claims brought against Louisiana police officers under § 1983 because such claims

---

[25] No. Civ. A. 01-599, 2001 WL 1397318 (E.D. La. Nov. 8, 2001) (unpublished).

[26] *Id.* at *3 (internal quotation marks omitted).

[27] *Id.* (internal quotation marks omitted).

[28] *Id.*

13

necessarily involve conduct amounting to criminal battery under Louisiana law. "Consequently," the court opined, "two provisions of the contract--one expressly covering liability for 'violation of civil rights' and one excluding coverage for injury or damage resulting from a 'criminal' act--are directly in conflict."[29] The court found that it was "unclear from the contract which provision trumps," giving rise to an ambiguity requiring the court to adopt "the interpretation that provides coverage."[30]

In reaching this conclusion, the *Manis* court relied on the reasoning of the Sixth Circuit in *North Bank v. Cincinnati Insurance Companies*. In *North Bank*, the Sixth Circuit held that an insurance policy was ambiguous when it provided coverage for occurrences which "unexpectedly or unintentionally" caused "personal injury," and defined personal injury to encompass "a number of torts which are inherently intentional," including discrimination.[31] Calling this a "studied ambiguity," the court observed that "[i]n selling the policies, the insurance company uses these conflicting provisions to 'create the impression that the policy provides coverage for an employer's intentional employment discrimination,'" only to deny coverage when an actual

---

[29] *Id.* at *5.

[30] *Id.*

[31] 125 F.3d 983, 986 (6th Cir. 1997) (internal quotation marks omitted).

14

claim is made.[32]  Noting that other courts reviewing similar policy language had "concluded that the provisions of the policies are internally inconsistent because they appear to provide coverage for 'unintentional' 'intentional' torts," the court concluded that the "ambiguity in the policy must be resolved in favor of the insured."[33]

Louisiana state courts have not addressed whether an insurance policy that provides coverage for discrimination while excluding coverage for intentional acts is ambiguous.  Louisiana courts have held that, "subject to the rules of insurance contract interpretation, insurance companies have the right to limit coverage in any manner they desire, so long as the limitations do not conflict with statutory provisions or public policy."[34]  Consistent with this approach, Louisiana courts have found insurance policies to be ambiguous when they declare in one clause that a particular coverage exists, while declaring in another that

---

[32] *Id.* at 987 (quoting Sean W. Gallagher, *The Public Policy Exclusion and Insurance for Intentional Employment Discrimination*, 92 MICH. L. REV. 1256, 1296 n.173 (1994)).

[33] *Id.* at 986-87.

[34] *Edwards v. Daugherty*, 883 So. 2d 932, 947 (La. 2004); *see also Marcus v. Hanover Ins. Co.*, 740 So. 2d 603, 606 (La. 1999) ("Absent a conflict with statutory provision or public policy, insurers are entitled to limit their liability and to impose reasonable conditions upon the obligations they contractually assume."); *accord Reynolds v. Select Props. Ltd.*, 634 So. 2d 1180, 1183 (La. 1994).

such coverage is excluded.[35]  However, Louisiana courts have given effect to unambiguous exclusions that cut back, but do not eliminate, particular grants of coverage for intentional acts.[36]

We are persuaded that the exclusion for intentional acts in the School Board's policy does not conflict with the policy's coverage for racial discrimination and racial harassment.  It is well settled that claims for racial discrimination may allege either "intentional" or "unintentional" acts.  Specifically, "[i]n the context of Title VII litigation, we recognize two types of discrimination claims: disparate treatment and disparate impact."[37] "Disparate treatment refers to *deliberate* discrimination in the terms or conditions of employment," whereas disparate impact claims

_____

[35] *See McIntosh v. McElveen*, 893 So. 2d 986, 991-92 (La. Ct. App. 2005); *Cugini Ltd. v. Argonaut Great Cent. Ins. Co.*, 889 So. 2d 1104, 1113 (La. Ct. App. 2004) (conflict between coverage provisions and exclusions gives rise to ambiguity which must be resolved in favor of coverage); *Gottsegen v. Hart Prop. Mgmt. Inc.*, 820 So. 2d 1138, 1142 (La. Ct. App. 2002) (finding that when "a conflict exists between the declared coverage that was negotiated and paid for and the exclusion that states that same hazard is not covered," an ambiguity exists that must be interpreted in favor of coverage); *Domingue v. Rodrigue*, 686 So. 2d 132, 137 (La. Ct. App. 1996) ("[A]n insurance policy cannot in one clause declare that there is coverage . . . and in another clause declare that there is no coverage . . . ."); *Korossy v. Sunrise Homes, Inc.*, 653 So. 2d 1215, 1229 (La. Ct. App. 1995) (conflict between exclusion and narrowed coverage provision which eliminated coverage created an ambiguity to be construed against the drafter in favor of coverage).

[36] *See Stein v. Martin*, 709 So. 2d 1041 (La. Ct. App. 1998) (finding policy unambiguous and not contradictory when it provided coverage for sexual misconduct but excluded coverage for any person who personally participated in an act of sexual misconduct); *Michelet v. Scheuring Sec. Servs. Inc.*, 680 So. 2d 140, 147-48 (La. Ct. App. 1996) (finding policy unambiguous when it extended coverage for battery, but excluded coverage for criminal conduct or conduct that violated a penal statute); *see also Motorola, Inc. v. Associated Indem. Corp.*, 878 So. 2d 824, 829 (La. Ct. App. 2004) ("[A] court should not strain to find ambiguity in a policy where none exists.").

[37] *Munoz v. Orr*, 200 F.3d 291, 299 (5th Cir. 2000).

16

"do not require proof of intent to discriminate."[38] As written, the policy can readily be interpreted to extend coverage for claims alleging disparate impact discrimination while excluding coverage for disparate treatment discrimination.

A similar result was reached by the Seventh Circuit in *Solo Cup Co. v. Federal Insurance Co.*[39] In *Solo Cup*, an insured sued its insurer seeking to enforce its insurer's indemnity and defense obligations with respect to a Title VII claim for sexual discrimination. The policy provided coverage for loss sustained as a result of an "occurrence," which it defined as "an accident or happening or event or a continuous or repeated exposure to conditions which unexpectedly and unintentionally results in personal injury."[40] The policy defined "personal injury" to include "discrimination" and "humiliation."[41] The court held that the insurer had no duty to defend or indemnify its insured against Title VII claims grounded on allegations of disparate treatment discrimination because such claims necessarily involved a determination that the insured "acted with a discriminatory motive

---

[38] *Id.* (emphasis added); *see E.E.O.C. v. J.M. Huber Corp.*, 927 F.2d 1322, 1328 n.24 (5th Cir. 1991) ("[U]nder an impact theory, the employee need not prove intentional discrimination, but need only show that a certain employment policy has a disparate impact on a protected group." (citing *Griggs v. Duke Power Co.*, 401 U.S. 424, 430 n.6 (1971)).

[39] 619 F.2d 1178 (7th Cir. 1980).

[40] *Id.* at 1181.

[41] *Id.* at 1182.

17

or purpose."[42] However, the court held that the insurer was obligated to defend and indemnify its insured against claims alleging disparate impact discrimination because such claims require no proof of discriminatory motive.

While acknowledging the existence of disparate impact claims, the School Board argues that a conflict cannot be averted between the policy's exclusion for intentional acts and its provision of coverage for racial harassment. This argument fails to account for the fact that employers such as the School Board are often held directly liable under Title VII for *negligently* failing to take prompt and immediate remedial action with respect to a hostile work environment created by, *inter alia*, racial harassment.[43]

In short, while the policy's exclusion for intentional acts cabins the scope of the policy's coverage, it does not render the policy's discrimination and harassment provisions wholly ineffective. Furthermore, it does not give rise to an absurd

---

[42] *Id.* at 1186.

[43] *See Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 759 (1998) ("[A]lthough a supervisor's sexual harassment is outside the scope of employment because the conduct was for personal motives, an employer can be liable, nonetheless, where its own negligence is a cause of the harassment."); *id.* ("Negligence sets a minimum standard for employer liability under Title VII . . . ."); *Celestine v. Petroleos de Venezuela SA*, 266 F.3d 343, 353 (5th Cir. 2001) ("A prima facie case of racial harassment alleging hostile work environment normally consists of five elements: . . . (5) the employer knew *or should have known* of the harassment in question and failed to take prompt remedial action." (emphasis added)); *Sharp v. City of Houston*, 164 F.3d 923, 929 (5th Cir. 1999) ("An employer may be liable for sexual harassment if it 'knew or should have known of the harassment in question and failed to take prompt remedial action.'" (quoting *Williamson v. City of Houston*, 148 F.3d 462, 464 (5th Cir. 1999))).

18

outcome whereby the policy completely takes back with one hand what it gives with the other. Consequently, we conclude that no intractable or irreconcilable conflict exists between the policy's coverage of racial discrimination and harassment and its exclusions.[44]

The School Board also argues that regardless of whether the policy is ambiguous, it must be interpreted in a manner consistent with the reasonable expectations of a typical purchaser of insurance. The Board contends that no purchaser of insurance would

---

[44] Our interpretation of the policy is buttressed by the apparent existence in Louisiana law of a public policy prohibiting a person from insuring against his own intentional acts. *See First Mercury Syndicate, Inc. v. New Orleans Private Patrol Serv., Inc.*, 600 So. 2d 898, 902 (La. Ct. App. 1992) (finding that "it would violate public policy to allow indemnification for such wrongdoing on the part of the insured" when insured corporate officers paid themselves excessive compensation for no work, placed family members on the corporate payroll when such members were not working, raided corporate funds for personal use, and enacted a resolution indemnifying themselves against their own wrongful acts.); *Williams v. Diggs*, 593 So. 2d 385, 387 (La. Ct. App. 1991) ("[W]hen considering an intentional injury exclusion in an automobile liability policy, another well-established public policy must also be given consideration. This is the policy against allowing a person to insure himself against his own intentional acts causing injury to others."); *Leon Lowe & Sons, Inc. v. Great Am. Surplus Lines Ins. Co.*, 572 So. 2d 206, 210 (La. Ct. App. 1990) ("Public policy forbids a person from insuring against his own intentional acts, but does not forbid him from insuring against the intentional acts of another for which he may be vicariously liable."); *Vallier v. Oilfield Constr. Co.*, 483 So. 2d 212, 218 (La. Ct. App. 1986) ("It is a longstanding principle of public policy that no person can insure against his own intentional acts." (citing *Baltzar v. Williams*, 254 So. 2d 470, 472 (La. Ct. App. 1971)); *Swindle v. Haughton Wood Co.*, 458 So. 2d 992, 995 (La. Ct. App. 1984) ("No person can insure against his own intentional acts. Public policy forbids it. But public policy does not forbid one to insure against the intentional acts of another for which he may be vicariously liable." (quoting *McBride v. Lyles*, 303 So. 2d 795, 799 (La. Ct. App. 1974) (citations omitted)); *see also Creech v. Aetna Cas. & Sur. Co.*, 516 So. 2d 1168, 1172 (La. Ct. App. 1988) (noting that "[t]he provisions of the insurance policy should be given effect except to the extent they conflict with law or public policy," and holding that public policy does not preclude coverage of exemplary damage awards). This public policy constitutes an additional aid to construction indicating that the policy's coverage provisions and exclusions are not locked in irremediable conflict. *See* 7 LEE R. RUSS & THOMAS F. SEGALLA, COUCH ON INSURANCE § 101:22 (3d ed. 1995) (noting that public policy may be resorted to as an "aid to construction").

19

engage in the "semantic hair splitting" necessary to reconcile the policy's coverage of discrimination with its exclusion for intentional acts. Rather, a purchaser would believe that the policy covers acts of discrimination regardless of whether intent comprised a necessary part of a cause of action based on such acts.

In essence, the Board asks that we re-write the terms of the insurance policy to conform with the reasonable expectations of a typical purchaser of insurance. This step is foreclosed by Louisiana law, which precludes use of the reasonable expectations doctrine to recast policy language when such language is clear and unambiguous.[45] Because the language of the policy at issue here is unambiguous, we cannot impose an alternative meaning on the policy by way of interpretation.

In sum, we can find no basis for interpreting the policy to extend coverage for loss caused by acts of racial discrimination and harassment committed with knowledge of their wrongful nature or intent to cause damage. Accordingly, Mid-Continent has no duty to defend or indemnify the School Board against Coleman's claims for intentional racial discrimination under 42 U.S.C. §§ 1981 and 1983. In addition, because Coleman has not alleged facts supporting a claim for disparate impact discrimination or any other discrimination claim not required proof of intent, Mid-Continent has no duty to defend or indemnify the School Board against

[45] *See La. Ins. Guar. Ass'n.*, 630 So. 2d at 763; *Mayo*, 869 So. 2d at 99-100; *Reynolds*, 634 So. 2d at 1183.

Coleman's Title VII claim.  The district court did not err in so holding.

B

We turn next to the question of whether Coleman's complaint contained allegations of non-intentional conduct sufficient to trigger Mid-Continent's duty to defend.  Under Louisiana law, "the scope of the duty to defend under an insurance agreement is broader than the scope of the duty to provide coverage."[46]  "The insurer's duty to defend is determined solely from the plaintiff's pleadings and the policy, without consideration of extraneous evidence."[47] "If 'there are any facts in the complaint which, if taken as true, support a claim for which coverage is not unambiguously excluded,' the insurer must defend the insured."[48]  "[O]nce a complaint states one claim within the policy's coverage, the insurer has a duty to accept defense of the entire lawsuit, even though other claims in

---

[46] *Suire v. Lafayette City-Parish Consol. Gov't*, ---So. 2d----, 2005 WL 832362, at \*\*18 (La. April 12, 2005); *see Lamar Adver. Co. v. Cont'l Cas. Co.*, 396 F.3d 654, 660 (5th Cir. 2005); *Selective Ins. Co. of S.E. v. J.B. Mouton & Sons, Inc.*, 954 F.2d 1075, 1077 (5th Cir. 1992).

[47] *Selective Ins. Co. of S.E.*, 954 F.2d at 1078.

[48] *Lamar Adver. Co.*, 396 F.3d at 660 (quoting *Complaint of Stone Petroleum Corp.*, 961 F.2d 90, 91 (5th Cir. 1992)); *see Jensen v. Snellings*, 841 F.2d 600, 612 (5th Cir. 1988) ("Where the pleadings, taken as true, allege both coverage under the policy and liability of the insured, the insurer is obligated to defend, regardless of the outcome of the suit or the eventual determination of actual coverage."); *Suire*, 2005 WL 832362, at \*\*18 ("Unless unambiguous exclusion of all the plaintiff's claims is shown, the duty to defend arises.").

21

the complaint fall outside of the policy's coverage."[49] Furthermore, "allegations in the complaint are liberally interpreted to determine whether they establish the insurer's duty to defend."[50] We look only to the *factual* allegations in the complaint, however; "statements of conclusions in the complaint that are unsupported by factual allegations will not trigger a duty to defend."[51]

In her complaint, Coleman alleged that she was hired to serve as associate principal at Rayville Elementary as part of a political agreement between white and black members of the School Board. She alleged that after the bond issue passed, she was asked to resign by the superintendent of the School Board. She alleged that after she refused this request, she was "subjected to disparate enforcement of the Board's rules and regulations and written-up continuously for infractions she had not committed." Further, she alleged that she was purportedly terminated by the Board for "cause," but that this termination decision occurred "without the consent and approval of several African-American Board

---

[49] *Montgomery Elevator Co. v. Bldg. Eng'g Servs. Co.*, 730 F.2d 377, 382 (5th Cir. 1984) (internal quotation marks omitted) (citing *Am. Auto. Ass'n v. Globe Indem. Co.*, 362 So. 2d 1206, 1209 (La. Ct. App. 1978)).

[50] *Jensen*, 841 F.2d at 612; *see Lamar Adver. Co.*, 396 F.3d at 660 ("In making [the duty to defend] determination, this Court must liberally interpret the complaint.").

[51] *Jensen*, 841 F.2d at 612 (citing *Guidry v. Zeringue*, 379 So. 2d 813, 816 (La. Ct. App. 1980)); *see Yarbrough v. Fed. Land Bank of Jackson*, 731 So. 2d 482, 489 (La. Ct. App. 1999) ("It is well settled that the allegations of fact, and not conclusions, contained in the petition determine the obligation to defend.").

22

members who were not in favor of terminating" her contract.

Based on these facts, Coleman asserted, *inter alia*, a claim for abuse of rights alleging that the "School Board acted in the absence of a serious and legitimate interest that is worthy of judicial protection; alternatively, acted in violation of moral rules, good faith, or elementary fairness; in the further alternative, exercised a right for a purpose other than that for which it was granted." The Louisiana Supreme Court has described the abuse of rights doctrine in the following terms:

> In its origin, the abuse of rights doctrine was applied to prevent the holder of rights or powers from exercising those rights exclusively for the purpose of harming another, but today most courts in civil law jurisdictions will find an act abusive if the predominant motive for it was to cause harm. . . . The doctrine has been applied where an intent to harm was not proven, if it was shown that there was no serious and legitimate interest in the exercise of the right worthy of judicial protection. Protection or enforcement of a right has been denied when the exercise of the right is against moral rules, good faith or elementary fairness. Another criteria, espoused originally by the French scholar Louis Josserand, would require an examination of the purpose for which the right was granted. If the holder of the right exercised the right for a purpose other than that for which the right was granted, then he may have abused the right.[52]

Louisiana courts will apply the abuse of rights doctrine only when one of four conditions is met:

> (1) the exercise of rights exclusively for the purpose of harming another or with the predominant motive to cause harm;

> (2) the non-existence of a serious and legitimate

---

[52] *Ill. Cent. Gulf R.R. Co. v. Int'l Harvester Co.*, 368 So. 2d 1009, 1014 (La. 1979) (citations omitted).

interest that is worthy of judicial protection;

(3) the use of the right in violation of moral rules, good faith or elementary fairness; or

(4) the exercise of the right for a purpose other than that for which it was granted.[53]

Courts will find an abuse of rights "only in limited circumstances because its application renders unenforceable one's otherwise judicially protected rights."[54]

The School Board's policy provides coverage for loss resulting from claims based on wrongful acts, and defines "wrongful act" to mean "any actual or alleged act, error, omission, misstatement, misleading statement, neglect or breach of duty . . . including *but not limited to*" a variety of specifically enumerated acts. This broad provision is sufficient to provide coverage for Coleman's claim that the School Board abused her rights when it voted to terminate her employment.

Mid-Continent argues that coverage for Coleman's abuse of rights claim is clearly precluded by the policy's exclusion for acts done with knowledge of their wrongful nature or with intent to cause harm. Mid-Continent contends that although a claim for abuse of rights may be established without proving intent to cause harm, the facts pleaded by Coleman in support of her abuse of rights claim allege only intentional conduct. Accordingly, Mid-Continent

---

[53] *Oliver v. Cent. Bank*, 658 So. 2d 1316, 1321 (La. Ct. App. 1995); *see Truschinger v. Pak*, 513 So. 2d 1151, 1154 (La. 1987).

[54] *Truschinger*, 513 So. 2d at 1154.

24

asserts that Coleman's claim as pleaded in her complaint is clearly excluded from coverage under the terms of the policy.

Interpreting Coleman's complaint liberally, we find that she alleged facts which, if true, would support a finding of liability under an abuse of rights theory without requiring proof of intent to cause harm. Specifically, if Coleman were unable to prove that the School Board terminated her on account of her race, she would have the option of proving that the Board "acted in the *absence* of a serious and legitimate interest that is worthy of judicial protection." Coleman explicitly alleged that, following her meeting with the Board Superintendent at which he asked her to resign, she was subjected to disparate enforcement of the Board's rules and written-up for infractions that she did not commit. Implicit in this allegation is the assertion that Coleman did not commit an infraction for which she could be rightfully terminated under her contract of employment. Based on this assertion, a jury could hold the School Board liable for abusing Coleman's rights under her employment contract by firing her without cause, while simultaneously holding that the Board's actions were not actuated by intentional racial discrimination.

Coleman's factual allegations could also support a garden-variety breach of contract claim. Although Coleman asserts a breach of contract cause of action in her complain, Mid-Continent argues that this claim is not covered because it is premised on

25

actions taken by the School Board in "bad faith." Mid-Continent notes that, under Louisiana law, a claim for bad faith breach of contract requires a showing of "an intentional and malicious failure to perform."[55] The School Board concedes that a claim for bad faith breach of contract is not covered under the policy. When determining whether an insurer has a duty to defend, however, we look to the facts pleaded in the plaintiff's complaint. Coleman alleged that she was terminated after being written-up for infractions that she did not commit. Even if a jury were to disbelieve Coleman's claims of intentional racial discrimination, it could still find that the School Board breached her employment agreement by terminating her without cause. To this effect, the policy explicitly provides coverage for "actual or alleged interference with or breach of any employment contract whether oral, written, express or implied."

Accordingly, we hold that Mid-Continent had a duty to defend the School Board against Coleman's lawsuit. Under Louisiana law, an insurer that breaches its duty to defend its insured is "liable in damages for attorney fees and costs the insured incurs in defending the suit."[56] We remand for a determination of these

---

[55] LA. CIV. CODE ANN. art. 1997, cmt. c (West 1987).

[56] *Bossier Plaza Assocs. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 813 So. 2d 1114, 1119 (La. App. 2d Cir. 2002); *see Smith v. Reliance Ins. Co. of Ill.*, 807 So. 2d 1010, 1022 (La. Ct. App. 2002) ("Louisiana law is well settled that an insurer's failure to defend the insured on plaintiffs' allegations renders the insured liable for attorney's fees incurred by the insured . . . ." (citing *Steptore v. Masco Const. Co., Inc.*, 643 So. 2d 1213, 1218 (La. 1994))).

26

amounts.  In addition, to the extent that the School Board seeks indemnity from Mid-Continent for the amount of its settlement with Coleman, we remand for a determination of whether the Board has demonstrated potential liability with respect to Coleman's covered claims,[57] and the amount of the settlement allocable to such claims.[58]

IV

With respect to its holding that the policy of insurance issued by Mid-Continent to the School Board does not cover acts of racial discrimination committed with actual knowledge of their wrongful nature or with intent to cause harm, the judgment of the district court is affirmed.  However, with respect to its holding that Mid-Continent had no duty to defend the School Board, the judgment of the district court is reversed, and this case is remanded for further proceedings consistent with this opinion.

AFFIRMED in part, REVERSED in part, and REMANDED.

---

[57] *See Sullivan v. Franicevich*, 899 So. 2d 602, 609 (La. Ct. App. 2005); *Vaughn v. Franklin*, 785 So. 2d 79, 87 (La. Ct. App. 2001) ("As a general rule, one seeking indemnity must establish actual liability to recover.  An exception to the rule is that the indemnitee need show only potential, rather than actual, liability on his part where the claim is based on a written contract, such as an insurance policy." citation omitted)); *Rovira v. LaGoDa, Inc.*, 551 So. 2d 790, 795 (La. Ct. App. 1989) ("Where a claim is based on a written contract of indemnity or insurance, the indemnitee must show potential, rather than actual, liability on his part in order to recover from the indemnitor." (citing *Terra Res., Inc. v. Lake Charles Dredging & Towing Inc.*, 695 F.2d 828 (5th Cir. 1983))).

[58] It is premature for us to decide whether Louisiana law permits an insured to recover the *entire* balance of a settlement amount when coverage is potentially available for only a fraction of the claims alleged in the plaintiff's complaint.  We note, however that when applying Texas law we have held that coverage "cannot be created *ex nihilo* by estoppel."  *See Enserch Corp. v. Shand Morahan & Co., Inc.*, 952 F.2d 1485, 1493 (5th Cir. 1992) (Wisdom, J.).