24-2748-cv
*Granite State Insurance Co. v. Primary Arms, LLC*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

August Term 2025

(Argued: September 17, 2025    Decided: December 10, 2025)

Docket No. 24-2748-cv

GRANITE STATE INSURANCE COMPANY,
NATIONAL UNION FIRE INSURANCE COMPANY OF
PITTSBURGH, PA.,

*Plaintiffs-Counter-Defendants-Appellees*,

*- against -*

PRIMARY ARMS, LLC,

*Defendant-Counter-Claimant-Appellant*.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

Before:

CHIN, NARDINI, AND KAHN, *Circuit Judges*.

Appeal from a judgment of the United States District Court for the Southern District of New York (Schofield, *J.*) in favor of two insurance companies, holding that they had no duty under Texas law to defend or indemnify a firearms retailer in three underlying lawsuits. The district court held that the underlying suits do not trigger a duty to defend or indemnify under the relevant insurance liability policies because they do not allege injury arising from an "accident" as that term is defined by Texas law. We agree and, accordingly, affirm the judgment of the district court.

AFFIRMED.

CHRISTOPHER J. ST. JEANOS (John Goerlich and James E. Fitzmaurice, *on the brief*), Willkie Farr & Gallagher LLP, New York, NY, and Washington, DC, *for Plaintiffs-Counter-Defendants-Appellees.*

ALEXANDER T. BROWN (Alana M. McMullin, *on the brief*), Lathrop GPM LLP, Kansas City, MO, *for Defendant-Counter-Claimant-Appellant.*

Laura A. Foggan, Crowell & Moring LLP, Washington, D.C., *for Amicus Curiae Complex Insurance Claims Litigation Association in Support of Plaintiffs-Appellees and Affirmance.*

2

CHIN, *Circuit Judge*:

In this case, two insurance companies dispute their duty to defend and indemnify a Texas-based firearms retailer in lawsuits arising from the retailer's alleged sales of "ghost gun" kits and parts for "ghost guns." Defendant-Appellant Primary Arms, LLC ("Primary Arms") sells and ships firearms and firearm components, including to residents of New York. Plaintiffs-Appellees Granite State Insurance Company ("Granite State") and National Union Fire Insurance Company of Pittsburgh, Pa. ("National Union" and together, the "Insurers") issued liability policies to Primary Arms (the "Policies") covering certain damages caused by "accidents."

In 2022, the State of New York (the "State"), the City of Buffalo ("Buffalo"), and the City of Rochester ("Rochester") filed separate lawsuits against Primary Arms and other firearms retailers (the "Underlying Suits"), alleging that the defendants' intentional marketing and sales of firearm parts led to increased gun violence and, consequently, economic damages to the plaintiffs, which were required to expend resources on law enforcement and community services due to the influx of illegal firearms. The Insurers then filed this action, seeking a declaration that they have no duty to defend or indemnify Primary Arms in the

3

Underlying Suits. The district court held that the Policies do not extend to the Underlying Suits and entered judgment for the Insurers on all counts.

We hold that, because the Underlying Suits do not allege an "accident" as required to trigger coverage under the Policies, the Insurers have no duty to defend or indemnify Primary Arms in those cases. We therefore AFFIRM the decision of the district court.

## BACKGROUND

The parties agree that Texas law applies.[1] Under Texas law, we determine the Insurers' duty to defend by considering only the allegations of the Underlying Suits and the provisions of the Policies. *See Monroe Guar. Ins. Co. v.*

---

[1] *See Chau v. Lewis*, 771 F.3d 118, 126 (2d Cir. 2014) ("[I]mplied consent . . . is sufficient to establish choice of law." (quoting *Krumme v. WestPoint Stevens, Inc.*, 238 F.3d 133, 138 (2d Cir. 2000))). The choice of Texas law is also appropriate under New York's choice-of-law rules. *See Thea v. Kleinhandler*, 807 F.3d 492, 497 (2d Cir. 2015) (explaining that a federal court sitting in diversity must apply the choice-of-law rules of the state in which it sits). In insurance actions, New York courts tend to apply the "law of the state which . . . was . . . the principal location of the insured risk." *Schwartz v. Liberty Mut. Ins. Co.*, 539 F.3d 135, 152 (2d Cir. 2008) (citation modified); *see also Zurich Ins. Co. v. Shearson Lehman Hutton, Inc.*, 642 N.E.2d 1065, 1069 (N.Y. 1994). If the insured risk "is scattered throughout multiple states, [New York] courts . . . deem the risk to be located . . . in the state of the insured's domicile at the time the policy was issued." *Certain Underwriters at Lloyd's v. Foster Wheeler Corp.*, 822 N.Y.S.2d 30, 36 (App. Div. 1st Dep't 2006) (citation modified), *aff'd*, 876 N.E.2d 500 (N.Y. 2007); *see also Fireman's Fund Ins. Co. v. Great Am. Ins. Co. of N.Y.*, 822 F.3d 620, 642 (2d Cir. 2016). Here, as the Policies cover multiple states, the principal location of the insured risk is deemed to be Primary Arms' domicile of Texas, where the LLC is headquartered.

*BITCO Gen. Ins. Co.*, 640 S.W.3d 195, 199 (Tex. 2022).[2]  In "comparing the allegations in the plaintiff's petition to the policy provisions," we disregard the "truth or falsity of those allegations."  *Id.*

## I.    *The Underlying Lawsuits*

The facts alleged in the Underlying Suits may be summarized as follows.  We take as our primary framework the State complaint against Primary Arms, which the Buffalo and Rochester complaints largely mirror.[3]

### A.    *Primary Arms' Sales of Firearms and Firearm Parts*

Primary Arms sells and ships firearms and firearm parts, including unfinished firearm frames and receivers, to locations across the United States, including New York.  Between July 25, 2016 and August 9, 2022, Primary Arms sent at least 25,428 packages into New York, with a "significant portion" consisting of unfinished firearm frames and receivers.  App'x at 57-58.

---

[2]    In some cases, a court may look beyond the pleadings and insurance policy if "the insured and a third party suing the insured colluded to make false representations of fact to secure a defense and create coverage where it would not otherwise exist." *Monroe Guar. Ins. Co.*, 640 S.W.3d at 199.  This exception does not apply here.

[3]    Unlike the State complaint, the two city complaints do not include negligence per se or negligent entrustment claims.  *Compare* Second Am. Compl. at 116-19, *New York v. Arm or Ally, LLC*, No. 1:22-cv-06124 (S.D.N.Y. Mar. 13, 2023), Dkt. No. 157, *with* Compl. at 179-89, *City of Buffalo v. Smith & Wesson Brands, Inc.*, No. 1:23-cv-00066 (W.D.N.Y. Jan. 23, 2023), Dkt. No. 1-1 Ex. B, *and* Compl. at 183-93, *City of Rochester v. Smith & Wesson Brands, Inc.*, No. 6:23-cv-06061 (W.D.N.Y. Jan. 24, 2023), Dkt. No. 1-3 Ex. B.

Primary Arms' "extensive marketing efforts tout[] [its] products as a way around background checks and other public safety laws." *Id.* at 52. For instance, federal law requires firearm manufacturers to stamp every firearm with a serial number and to keep records of which serial number corresponds to which weapon, so that law enforcement officers can quickly trace guns recovered at crime scenes. Federal law also requires that firearm purchasers undergo a background check, which ensures that guns do not fall into "the hands of dangerous persons." *Id.* at 47. Primary Arms, however, designs and produces its products to skirt "the definition of a 'firearm' simply by leaving a few key holes undrilled or plastic unfiled." *Id.* at 39. Primary Arms then sells its firearm parts without the serialization or background checks required for finished firearms and without ensuring that buyers possess a firearms license. Consequently, with Primary Arms' help, individuals can "easily convert[]" the unfinished weapons kits they purchase from Primary Arms into untraceable firearms called "ghost guns." *Id.* at 38-39. Primary Arms even "provid[es] jigs and equipment to help customers convert the[] [products] into ghost guns, as well as instructions, guides, and technical support." *Id.* at 52. "[O]nce completed, there is no

6

meaningful difference between [Primary Arms'] products and a frame or receiver one could buy at a gun store." *Id.* at 39.

This "built-in evasion of federal and state laws" makes Primary Arms' products "naturally attractive to (and naturally marketed to) persons who would not be able to purchase guns legally." *Id.* at 41. As part of this business model, Primary Arms purposefully "fail[s] to exercise any controls on its sales." *Id.* at 56-57; *see also id.* at 144-45. Indeed, since at least June 2016, Primary Arms has embarked on a marketing program geared toward selling its ghost gun kits to "individuals who [are] likely to create an unreasonable risk of harm to others, such as those with criminal convictions, subject to restraining orders, with disqualifying mental health histories, or who lack[] proper licensing and training." *Id.* at 77. Through this deliberate marketing and sales strategy, Primary Arms knowingly "participate[s] in and facilitate[s] the secondary market where persons who have injurious intent obtain their firearms." *Id.* at 94; *see also id.* at 118-19.

Primary Arms' intentional marketing and sales scheme allegedly helped launch a surge of gun violence in New York. The "influx of ghost guns into New York" has threatened public health and safety by "(i) increasing the

number of firearms likely to be used in the commission of a crime, (ii)

diminishing or unwinding the effect of on-point legal protections, including

those relating to intimate partner violence, (iii) increasing the number of murders

and suicides, and (iv) creating a new primary and secondary market for illicit

guns in New York." *Id.* at 59. Consequently, the State, Buffalo, and Rochester

have been forced to monetarily respond to the crisis by expanding community

services, financing additional public hospital resources, and redirecting law

enforcement priorities.

### B. *The Policies*

The operative Policies cover the time period at issue in the

Underlying Suits. Under the Policies, the Insurers must defend and indemnify

Primary Arms in certain actions seeking damages because of bodily injury or

property damage. The Policies only extend, however, to cases in which the

alleged injury is caused by an "occurrence." *Id.* at 24; *see also id.* at 30. The

Policies define "occurrence" as "an accident, including continuous or repeated

exposure to substantially the same general harmful conditions." *Id.* at 26; *see also*

*id.* at 34.

8

### C.     *The Claims Against Primary Arms*

In 2022, the State, Buffalo, and Rochester sued Primary Arms and other gun companies in the Underlying Suits for damages resulting from the above-described allegations.  *See New York v. Arm or Ally, LLC*, No. 1:22-cv-06124 (S.D.N.Y.); *City of Buffalo v. Smith & Wesson Brands, Inc.*, No. 1:23-cv-00066 (W.D.N.Y.); *City of Rochester v. Smith & Wesson Brands, Inc.*, No. 6:23-cv-06061 (W.D.N.Y.).  The State lawsuit includes claims under N.Y. Executive Law § 63(12) for repeated or persistent illegal and fraudulent conduct; under N.Y. General Business Law § 898-c for public nuisance; under N.Y. General Business Law § 349 for deceptive acts and practices; under N.Y. General Business Law § 350 for false advertising; for negligence per se; and for negligent entrustment.  Meanwhile, Buffalo and Rochester brought claims under N.Y. General Business Law § 898-a-e for public nuisance; for common law public nuisance; and under N.Y. General Business Law §§ 349-50 for deceptive business practices.

## II.     *The Proceedings Below*

After the State, Buffalo, and Rochester filed the Underlying Suits, Primary Arms demanded that Granite State defend it by paying its legal costs and indemnify it by paying any potential settlements or judgments against it

resulting from the lawsuits.  Although Primary Arms did not tender notice of the lawsuits to or seek coverage from National Union, both Insurers sent Primary Arms letters denying coverage.

On August 29, 2023, the Insurers filed this action against Primary Arms, seeking a declaratory judgment that the Policies do not obligate them to defend or indemnify Primary Arms in the Underlying Suits.  On December 13, 2023, the Insurers moved for partial summary judgment on the issue of their duty to defend.  On January 19, 2024, Primary Arms cross-moved for partial summary judgment on the same issue.

The district court granted the Insurers' motion for partial summary judgment and denied Primary Arms' cross-motion on August 30, 2024, reasoning that the Underlying Suits did not allege an "accident" as required to trigger the duty to defend under the Policies.  The parties then filed a joint letter agreeing that the district court's ruling on the duty to defend also disposed of the Insurers' remaining claims on the duty to indemnify.  Accordingly, on September 16, 2024, the district court entered an order ruling that the Policies did not obligate the Insurers to indemnify Primary Arms for the same reasons that the Policies did

10

not obligate them to defend Primary Arms. Final judgment was entered in favor of the Insurers on all counts and dismissing Primary Arms' counterclaim.

This appeal followed.

### *DISCUSSION*

The principal issue presented is whether the Underlying Suits allege harm caused by an "accident" as that term is used in the Policies.[4] We conclude they do not.

We begin with a discussion of Texas law and the meaning of the word "accident." We then turn to the Insurers' duty to defend Primary Arms and explain why the allegations of the Underlying Suits do not allege an accident or, therefore, an occurrence, as required to invoke that duty. Finally, we note that the Insurers have no duty to indemnify Primary Arms for the same reasons, as the parties agreed below.

---

[4] The Insurers further contend that the Underlying Suits independently fail to satisfy a second criterion necessary to trigger coverage under the Policies, namely, that the Underlying Suits must seek "damages because of 'bodily injury.'" Appellees' Br. at 40-48. Because we find that the Underlying Suits do not allege an "accident," we need not decide this question here.

### III. *Standard of Review*

We review a district court's grant of summary judgment *de novo*. *Kowalchuck v. Metro. Transp. Auth.*, 94 F.4th 210, 214 (2d Cir. 2024). The same standard applies when the parties have filed cross-motions for summary judgment and the district court has granted one motion but denied the other. *Roberts v. Genting New York LLC*, 68 F.4th 81, 88 (2d Cir. 2023). We "view[] the evidence in the light most favorable to the nonmoving party to determine whether genuine issues of material fact preclude judgment as a matter of law" and "draw all reasonable inferences in [the nonmoving party's] favor." *Murphy v. Hughson*, 82 F.4th 177, 180, 183 (2d Cir. 2023). In the case of cross-motions, we evaluate each party's motion "on its own merits" and draw "all reasonable inferences" against the party whose motion we are considering. *Roberts*, 68 F.4th at 88 (quoting *Morales v. Quintel Ent., Inc.*, 249 F.3d 115, 121 (2d Cir. 2001)).

### IV. *Applicable Law*

#### A. *Texas' "Eight-Corners Rule"*

"Under [Texas'] eight-corners rule," we determine an "insurer's duty to defend . . . by comparing the allegations in the plaintiff's petition to the policy provisions, without regard to the truth or falsity of those allegations and without

reference to facts otherwise known or ultimately proven."  *Monroe Guar. Ins. Co.*, 640 S.W.3d at 199.  The duty to defend arises when "[a] plaintiff's factual allegations . . . potentially support a covered claim."  *Gore Design Completions, Ltd. v. Hartford Fire Ins. Co.*, 538 F.3d 365, 368 (5th Cir. 2008) (quoting *GuideOne Elite Ins. Co. v. Fielder Rd. Baptist Church*, 197 S.W.3d 305, 307 (Tex. 2006)); *see also Gonzalez v. Mid-Continent Cas. Co.*, 969 F.3d 554, 559 (5th Cir. 2020) ("[T]he duty to defend arises when 'the plaintiff alleges facts that would give rise to *any claim* against the insured that is covered by the policy.'" (quoting *Don's Bldg. Supply, Inc. v. OneBeacon Ins. Co.*, 267 S.W.3d 20, 31 (Tex. 2007))).

The Fifth Circuit, interpreting Texas law, has repeatedly underscored that the factual allegations in a complaint -- rather than legal theories, conclusory labels, or conclusory statements -- control the duty-to-defend analysis.  *See, e.g.*, *Gore Design Completions, Ltd.*, 538 F.3d at 369 ("It is the factual allegations, not the legal theories, that control."); *Coleman v. Sch. Bd. of Richland Par.*, 418 F.3d 511, 523 (5th Cir. 2005) ("[S]tatements of conclusions in the complaint that are unsupported by factual allegations will not trigger a duty to defend." (quoting *Jensen v. Snellings*, 841 F.2d 600, 612 (5th Cir. 1988))); *XL Specialty Ins. Co. v. Bollinger Shipyards, Inc.*, 800 F.3d 178, 182 (5th Cir. 2015) ("The

13

court considers the facts alleged in the underlying complaint rather than conclusory labels applied to claims.").  Put simply, "[i]f the underlying pleading alleges facts that may fall within the scope of coverage, the insurer has a duty to defend; if, on the other hand, the pleading only alleges facts excluded by the policy, there is no duty to defend."  *State Farm Lloyds v. Richards*, 966 F.3d 389, 393 (5th Cir. 2020) (quoting *Ooida Risk Retention Grp., Inc. v. Williams*, 579 F.3d 469, 472 (5th Cir. 2009)).

We liberally construe the factual allegations in favor of coverage. *GuideOne Elite Ins. Co.*, 197 S.W.3d at 308; *see also Gore Design Completions, Ltd.*, 538 F.3d at 368-69 ("[D]oubts are resolved in the insured's favor . . . . When in doubt, defend.").  Courts may not, however, "read facts into the pleadings" or "imagine factual scenarios which might trigger coverage."  *Uretek (USA), Inc. v. Cont'l Cas. Co.*, 701 F. App'x 343, 345 (5th Cir. 2017) (unpublished) (quoting *St. Paul Ins. Co. v. Tex. Dep't of Transp.*, 999 S.W.2d 881, 885 (Tex. App. 1999)).

### B.  *Meaning of "Accident" Under Texas Law*

Under the Policies, the Insurers need only defend Primary Arms against lawsuits claiming damages "caused by an 'occurrence.'"  App'x at 24.; *see also id.* at 30.  **[A219.]**  The Policies define "occurrence" as "an accident."  *Id.* at 26;

14

*see also id.* at 34.  Because the Policies do not define the term "accident," "we must interpret it in accordance with its 'generally accepted or commonly understood meaning.'"  *Nat'l Union Fire Ins. Co. of Pittsburgh v. Puget Plastics Corp.*, 532 F.3d 398, 402 (5th Cir. 2008) (quoting *Lamar Homes, Inc. v. Mid-Continent Cas. Co.*, 242 S.W.3d 1, 8 (Tex. 2007)).

"Consistent with ordinary usage, the Supreme Court of Texas has defined the term 'accident' as a 'fortuitous, unexpected, and unintended event.'"  *Frederking v. Cincinnati Ins. Co.*, 929 F.3d 195, 197 (5th Cir. 2019) (quoting *Lamar Homes, Inc.*, 242 S.W.3d at 8).  As articulated in *Discover Property & Casualty Insurance Co. v. Blue Bell Creameries USA, Inc.* ("*Blue Bell*"), a two-part test guides the accident inquiry under Texas law: An act "is not an accident when [1] [an individual] commits an intentional act that [2] results in injuries that ordinarily follow from or could be reasonably anticipated from the intentional act."  73 F.4th 322, 329 (5th Cir. 2023) (citation modified).

Under the first prong of the two-part test, "an intentional act and the intent to cause injury are two distinct concepts."  *Am. States Ins. Co. v. Bailey*, 133 F.3d 363, 372 n.11 (5th Cir. 1998), *abrogated on other grounds by*, *Liberty Mut. Fire Ins. Co. v. Copart of Conn., Inc.*, 75 F.4th 522, 535 (5th Cir. 2023).  "[T]he 'intentional

15

acts' requirement is concerned with the voluntariness of an action or omission, not the actor's intended outcome." *Blue Bell*, 73 F.4th at 329. Indeed, whether the insured subjectively "expects or intends the injury is of no consequence." *Id.* at 331 (alterations adopted) (quoting *Trinity Universal Ins. Co. v. Cowan*, 945 S.W.2d 819, 827-28 (Tex. 1997)).

Under the second prong of the test, if "either . . . the insured intended the injury . . . or . . . the resulting damage was the natural and expected result of the insured's actions," a claim does not allege an accident. *Lamar Homes, Inc.*, 242 S.W.3d at 9. This standard also applies even when "the insured was negligent." *Id.* Thus, an accident *has* transpired if an intentional act "is performed negligently" and "the effect is *not* what would have been intended or expected had the action been performed non-negligently." *Harken Expl. Co. v. Sphere Drake Ins. PLC*, 261 F.3d 466, 472 (5th Cir. 2001) (emphasis added). Framed differently, intentional acts do not constitute an accident -- or, thus, an "occurrence" -- if "(1) the resulting damage was 'highly probable' because it was 'the natural and expected result of the insured's actions,' (2) 'the insured intended the injury,' or (3) the insured's acts constitute an intentional tort, in which case,

the insured is presumed to have intended the injury." *Nat'l Union Fire Ins. Co. of Pittsburgh*, 532 F.3d at 402 (quoting *Lamar Homes, Inc.*, 242 S.W.3d at 8-9).

## V.     *The Insurers' Duty to Defend*

### A.     *The Underlying Suits Do Not Allege Harm Arising from an "Accident"*

We conclude that the Policies do not cover the Underlying Suits because the complaints do not allege an "accident" under Texas law or, thus, an "occurrence" under the Policies. We analyze the allegations of the Underlying Suits according to the two-step test distilled in *Blue Bell*.

> 1.     *The Underlying Suits Allege that Primary Arms Intentionally Sold Firearm Parts to Individuals Whom the Law Forbade from Owning Firearms and to Individuals Who Otherwise Posed a Risk of Harm to Others.*

As alleged in the Underlying Suits, Primary Arms concocted a business model to "exploit[] demand for unfinished frames and receivers . . . for [its] own financial benefit." App'x at 45. It carried out this plan by intentionally marketing and selling its products to New York consumers who "would not be able to purchase guns legally, or who want a gun that cannot be traced back to them." *Id.* at 41. Primary Arms thus "intended to sell and knowingly sold unfinished frames and/or receivers to individuals who were likely to create an unreasonable risk of harm to others, such as those with criminal convictions,

17

subject to restraining orders, with disqualifying mental health histories, or who lacked proper licensing and training." *Id.* at 77.

When Primary Arms advertised its products to these buyers as "easily convertible" into finished firearms, *id.* at 38, it sent its products into New York "knowing, intending, or being willfully blind to the fact that these products would be converted into working, unserialized firearms," *id.* at 70. Therefore, Primary Arms intended not only to sell its products but to sell them specifically to people "who could not buy a firearm through legitimate channels," *id.* at 69, and who "cannot and should not have a deadly weapon," *id.* at 41, but who nevertheless were motivated to possess a gun. Primary Arms therefore committed the requisite "intentional act" under the first prong of the test from *Blue Bell*. 73 F.4th at 329.

        2.    *The Resulting Financial Harm to the State, Buffalo, and Rochester Was the Natural and Expected Result of Primary Arms' Intentional Acts.*

As alleged in the Underlying Suits, Primary Arms' conduct spawned an "influx of ghost guns into New York . . . [that] (i) increas[ed] the number of firearms likely to be used in the commission of a crime, (ii) diminish[ed] or unw[ound] the effect of on-point legal protections, including those relating to intimate partner violence, (iii) increas[ed] the number of murders and suicides,

18

and (iv) creat[ed] a new primary and secondary market for illicit guns in New York." *Id.* at 59. These consequences could have been reasonably anticipated, in light of the allegation that Primary Arms "intended to sell and knowingly sold unfinished frames and/or receivers to customers intending to use them in the commission of a crime." *Id.* at 77-78. Thus, the damage was a "highly probable" result of Primary Arms' marketing, selling, and shipping strategy. *See Nat'l Union Fire Ins. Co. of Pittsburgh*, 532 F.3d at 402 (quoting *Lamar Homes*, Inc., 242 S.W.3d at 9).

The ensuing financial burdens on the State, Buffalo, and Rochester were not "fortuitous" or "unexpected." *Lamar Homes, Inc.*, 242 S.W.3d at 8. One would naturally expect that a state or local government responding to increased gun-related incidents would need to spend more -- on deploying police officers to the scenes of gun violence, on law enforcement investigations seeking to solve ghost-gun-related crimes, on expanding community support services for those affected by gun violence, and on hospital resources required to treat gun-related injuries. Therefore, the financial injuries to the State, Buffalo, and Rochester "ordinarily follow[ed] from" Primary Arms' intentional acts of marketing and

selling ghost gun kits to individuals legally prohibited from owning firearms.

*See Blue Bell*, 73 F.4th at 329 (quoting *Bailey*, 133 F.3d at 372).

Because Primary Arms "[1] commit[ted] . . . intentional act[s] that [2] result[ed] in injuries that ordinarily follow from or could be reasonably anticipated from the intentional act[s]," the asserted injuries do not arise from an "accident." *See id.* (quoting *Bailey*, 133 F.3d at 372). Accordingly, we hold that the Underlying Suits do not allege an occurrence as defined by the Policies.

## B. *Primary Arms' Arguments Fail*

### 1. *The State Complaint's Conclusory References to Negligence and Negligence-Based Legal Theories*

Primary Arms argues that its actions should be categorized as merely negligent, rather than intentional, based on Texas law's distinction between the *Maupin* line of cases (concerning intentional acts) and the *Orkin* line of cases (concerning negligent acts).[5] For support, it primarily points to a

---

[5] The two lines of cases take their names from *Argonaut Southwest Insurance Co. v. Maupin*, 500 S.W.2d 633 (Tex. 1973), and *Massachusetts Bonding & Insurance Co. v. Orkin Exterminating Co.*, 416 S.W.2d 396 (Tex. 1967). The *Maupin* category includes "damage that is the natural result of voluntary and intentional acts" -- and therefore does not involve an occurrence. *Federated Mut. Ins. Co. v. Grapevine Excavation, Inc.*, 197 F.3d 720, 723 (5th Cir. 1999). The *Orkin* category includes "negligent acts of the insured causing damage which is undesigned and unexpected" -- and therefore involves an occurrence. *Id.* at 725 (citation modified).

20

sentence from the State complaint alleging that, "given the nature of [the firearms manufacturers'] business practices and products, together with the known nature of the gun industry market and the statistical relationship between a gun manufacturer's conduct and gun crime outcomes, [the firearms manufacturers] are knowingly, *negligently*, and/or recklessly causing harm to New York's public health and safety."  App'x at 157 (emphasis added).

This argument fails because we must ignore conclusory legal labels when analyzing the duty to defend.  *See Gore Design Completions, Ltd.*, 538 F.3d at 369; *Coleman*, 418 F.3d at 523; *XL Specialty Ins. Co.*, 800 F.3d at 182.  "[A]rtful pleading suggesting that [an insured party's] acts were negligent or reckless cannot overcome the basic facts underlying the[] claims."  *Bailey*, 133 F.3d at 372.  Here, the State, Buffalo, and Rochester have not accused Primary Arms of negligently performing an intentional act where "the result would have been different had the deliberate act been performed correctly."  *Lamar Homes, Inc.*, 242 S.W.3d at 8.  Instead, the Underlying Suits allege that Primary Arms performed intentional acts *as intended* in pursuit of profit, by knowingly and willfully choosing to market, sell, and ship firearm parts to individuals in New York legally prohibited from owning guns.  *See, e.g.*, App'x at 41, 45, 68-69, 93-94, 118-

21

19. The Underlying Suits contain no factual allegations of negligence and therefore do not allege an accident.

The same analysis applies to the State complaint's inclusion of the negligence per se and negligent entrustment counts. The allegations corresponding to those claims accuse Primary Arms of "intend[ing] to sell and knowingly s[elling]" its products to individuals "who were likely to create an unreasonable risk of harm to others." App'x at 77. The counts allege that, as Primary Arms well knew, these individuals included people who desired to use Primary Arms' products for criminal purposes and who were ineligible to purchase guns legally. The complaint stresses that "[Primary Arms'] intent is demonstrated by the way [it] has emphasized the untraceability of [its] products in [its] marketing." *Id.* at 77-78. According to the factual allegations supporting these claims, therefore, Primary Arms "did exactly what [it] intended to do" when it sold and shipped its products to individuals likely to pose an unreasonable risk of harm to others. *See Cowan*, 945 S.W.2d at 827.

Moreover, "whether the insured was negligent or not," a complaint does not allege an accident if the "damage was the natural and expected result of the insured's actions." *Lamar Homes, Inc.*, 242 S.W.3d at 9. As explained above,

22

no unexpected result materialized here. Primary Arms intentionally "ma[de] no effort to determine whether [its] consumers were engaged in firearms trafficking or were ineligible to legally own a firearm," App'x at 142, and purposefully "failed to exercise any controls on its sales," *id.* at 56-57. Primary Arms deliberately implemented practices that naturally and expectedly led to increased gun violence and to the State, Buffalo, and Rochester's resulting financial injuries. Accordingly, the factual allegations supporting the state and city plaintiffs' claims for relief do not illustrate negligent conduct resulting in a "fortuitous, unexpected, and unintended event." *Lamar Homes, Inc.*, 242 S.W.3d at 8.

### 2. *"Products-Completed Operations" Coverage Theory*

Primary Arms next contends that we should carve out a special "accident" analysis for "products-completed operations hazard coverage," or -- in essence -- certain products liability cases.[6] Appellant's Br. at 13. We reject this proposal, for which we see no basis in Texas law.

---

[6]     Per the Policies, such coverage includes "bodily injury" and "property damage" that "occur[s] away from premises you own or rent and arising out of 'your product' or 'your work'" (with certain exceptions). App'x at 26; *see also id.* at 34.

According to Primary Arms, courts reviewing "products-completed operations" cases should discard the usual accident standard established in *Blue Bell* -- namely, that if an injury "ordinarily follows from or could be reasonably anticipated from the intentional act, then the act is not an accident, and thus not an occurrence." 73 F.4th at 331 (citation modified). Instead, Primary Arms suggests that the analysis for such cases should focus on "whether the seller necessarily expected or intended the alleged injuries or damages" subjectively. Appellants' Br. at 11. Primary Arms claims that this new theory makes sense because products-completed operations coverage "is specifically designed to protect policyholders from lawsuits alleging that the products it voluntarily or intentionally sold and marketed caused injury to others," and therefore coverage should be especially robust. *Id.* at 22.

Neither the Texas Supreme Court's cases nor the Fifth Circuit's holdings, however, justify creating a different standard for "accidents" in products-completed operations cases. *Blue Bell* itself involved a product; in the underlying action, shareholders sued Blue Bell's directors and officers for financial loss stemming from a *Listeria* outbreak caused by Blue Bell's product: ice cream. *See* 73 F.4th at 326. The shareholders claimed that the directors and

24

officers had breached their fiduciary duties when they knew that Blue Bell's manufacturing plants had repeatedly tested positive for *Listeria* contamination and yet continued to "manufacture and distribute ice cream products in conscious disregard of the known risks." *Id.* In the ensuing insurance coverage dispute, the directors and officers sought defense coverage from their insurance companies, which -- as here -- argued that the shareholder suit did not arise from an "accident" or "occurrence." *Id.* at 326-27. The *Blue Bell* court applied the standard accident analysis and held that the alleged injuries were not caused by an "occurrence," confirming that no divergent definition of "accident" applies in cases involving products. *See id.* at 329-30.

Primary Arms also cites to the products liability case *Zurich American Insurance Company v. Nokia, Inc.*, 268 S.W.3d 487 (Tex. 2008), for support. That reliance is misplaced, as *Nokia* spent almost no time on the accident analysis and focused instead on whether injury to human cells caused by cellphone radiation constituted "bodily injury" as required by the policies. *See id.* at 491-93. In holding that the insurers had a duty to defend, the *Nokia* court also seemingly concluded that the injuries had resulted from an accident, but it did not meaningfully discuss that question and drew no distinction between products-

completed operations coverage and other types of liability coverage. *See id.* at 491 ("The policies covered . . . 'bodily injury' caused by an occurrence during the policy period."). In fact, *Nokia* nowhere uses the phrase "products-completed operations."

Primary Arms points to one of two paragraphs in which the *Nokia* court did appear to discuss the occurrence analysis (albeit in a section about whether the damages had happened "because of" bodily injury), noting that coverage applied because "[t]he pleadings allege both intentional conduct ([the insured] knew of [the radiation's] harmful effects and nonetheless intentionally sold its products to consumers) and negligence ([the insured] should have known of [the radiation's] harmful effects)." *Id.* at 495. This reasoning merely affirms that courts determining an insurer's duty to defend must review all the factual allegations in the complaint; in *Nokia*, because factual allegations of *both* intentional conduct *and* negligence existed, the underlying complaints had alleged an occurrence triggering the insurers' duty to defend. *Id.* Thus, *Nokia* did not establish a new standard for products cases, and we decline Primary Arms' invitation to create a novel "products-completed operations coverage" rule under Texas law here.

### 3. *Allegations of Illegal Conduct*

Primary Arms further takes issue with the district court's discussion of allegations that Primary Arms broke the law in carrying out its marketing and sales scheme. Primary Arms argues that these allegations constitute legal theories, rather than factual allegations that a court may properly consider when undertaking a duty-to-defend analysis. We are, again, unpersuaded.

While it is true, of course, that the district court discussed the legal theories underlying the claims against Primary Arms and other gun companies, the district court focused on the factual allegations of illegal conduct to determine whether the Underlying Suits alleged intentional acts (such as purposefully avoiding mechanisms designed to reduce gun violence) with expected consequences (such as increased gun violence and attendant financial burdens on state and city governments). The district court concluded that the Underlying Suits indeed alleged that Primary Arms engaged in deliberate actions to "flout gun control laws and regulations that have been repeatedly demonstrated to lower gun violence," App'x at 221, and to "enable the anonymous acquisition of uncontrolled firearms with the predictable outcome of increasing gun violence," *id.* at 222. These assertions go to the heart of the two-

27

step *Blue Bell* analysis. *See* 73 F.4th at 331. The district court therefore properly considered the complaints' factual allegations in determining the Insurers' duty to defend.

Primary Arms also asserts that some of the claims of the Underlying Suits may fail if Primary Arms' products do not end up qualifying as "firearms" under federal law. Assuming without deciding that to be true, under Texas law, we "compar[e] the allegations in the plaintiff's petition to the policy provisions, *without regard to the truth or falsity of those allegations and without reference to facts otherwise known or ultimately proven*." *Monroe Guar. Ins. Co.*, 640 S.W.3d at 199 (emphasis added). Thus, whether or not all the legal theories in the complaints ultimately survive, and whether or not all the factual allegations ultimately prove to be true, have no bearing on the duty-to-defend determination.

## VI. *The Insurers' Duty to Indemnify*

For the same reasons, the Insurers have no duty to indemnify Primary Arms. "Unlike the duty to defend, an insurer's duty to indemnify is based on the 'actual facts' brought out in the underlying action," rather than the allegations of the complaint. *VRV Dev. L.P. v. Mid-Continent Cas. Co.*, 630 F.3d 451, 459 (5th Cir. 2011) (quoting *Ooida*, 579 F.3d at 472). Thus, the duty to

28

indemnify is typically resolved after the underlying action has concluded. *Id.* But the parties agreed below that the district court's ruling on the duty to defend was dispositive of the Insurers' duty to indemnify, and Primary Arms does not argue otherwise on appeal. Thus, under the principle of party presentation and the absence of "extraordinary circumstances" that might justify remand on the Insurers' duty to indemnify, we also hold that the Insurers have no duty to indemnify. *United States v. Sineneng-Smith*, 590 U.S. 371, 379 (2020).

## *CONCLUSION*

For the foregoing reasons, the judgment of the district court is AFFIRMED.

29